That leads to our second case, which is number 241735, Williams v. Selective Service System. Okay, Ms. Raptele. Good morning, Your Honors. May it please the Court, my name is Stephanie Raptele and I represent the petitioner, Kevin Williams, in the instant appeal against the Selective Service System. At this time, I'd like to reserve three minutes for rebuttal. Okay. Thank you. Petitioner respectfully requests that this Honorable Court reverse the initial decision that held that the agency met its burden regarding the removal decision and presented sufficient evidence to substantiate that removal. I would like to highlight two specific errors that the administrative judge made that are substantial and reversible. First, the judge applied or made an error of law when he and then she, there were two judges, failed to apply or incorrectly applied the Bornicoff factors in determining whether Mr. Clark's affidavit should be admitted as a substitute for Mr. Clark's actual testimony. And the judge made an error when evaluating the substantial evidence offered by the agency in support of its case-in-chief against Mr. Williams. Can I ask you just a question? Yes, Your Honor. What happened during the 60-day PIP? That's an excellent question, Your Honor. It was Mr. Williams' testimony that he actually did not work the majority of the 60-day PIP. He was only working 21 days. The rest of the time, and this is testimony that he provided during the hearing, the rest of the time he was out on medical leave. So did he ask that the, I'm sorry, did he ask that the time, did, but, okay, the rest of the time, but he was there for part of the time. Did he actually work and perform tasks during that time related to the requirements of the position of the GS-13, which he held? Mr., that is Mr. Williams' position that he attempted to try to do what Mr. Clark had set out. However, the, his request for training, he signed up for additional training. He, I believe, took one of the training courses at some point during that period of time. He asked and tried to remediate the issue with connecting to the server. It wasn't until the end of March, he received the performance improvement plan, March 1st, 2017. It wasn't until March 28th that he first met with Mr. Clark to have those meetings to go over. Isn't the answer that he didn't do any work during the PIP period, but that he claimed that he couldn't because he wasn't properly trained? Yes, Your Honor. And in addition, he wasn't able to get the resources that he needed to do the work. So, you know, he couldn't do what was being asked of him because he wasn't provided those opportunities. He wasn't getting the assistance that he needed. He availed himself to what was being offered to him, which was a series of YouTube videos from Mr. Clark. But that was not sufficient to get him up to speed to where he to be in his position to be able to complete those tasks. So do you agree that Mr. Williams did not complete any of his PIP tasks? In that 21-day period, I don't know that he was able to accomplish them to the level that they were written in the PIP. Mr. Williams did contest and dispute the communication. For example, he did communicate with Mr. Clark. He did reach out. He tried to make those efforts. I do think that there are tasks that are in the PIP that he was not able to complete because he didn't have access and he wasn't given the time and he didn't have the training. Was there a multi-month period where he didn't check his assigned tasks in TFS? TFS is the server that he did not have access to. So, yes, he couldn't access it. There was no way for him to be able to check anything in it if he couldn't get into it. And he brought it up to Mr. Clark constantly, which is his testimony, and there was no effort to try to give him access to that. Okay. But we're not here, as you well know, as fact-finders. And the administrative judge heard the witnesses, or at least in Mr. Clark's case, people had the affidavit. And your client could testify as to whether or not what Mr. Clark was saying was accurate. How are we on appeals? I mean, even the few comments you've made today about the training and what he did in the training and what he didn't, that's the A.J.'s job, not our job. And their conclusions seem adequate, at least, to establish the lower burden that you have on Chapter 43 cases than you have on Chapter 75 cases. So, tell me how we, as an appellate court with a limited role here, can dislodge all of the findings made by the A.J.? Your Honor, we're on appeal here in part because of the admission of Mr. Clark's testimony and the weight of that testimony over the testimony of the live witnesses that actually did testify. And you're not, there's no actual legal requirement that he had testified, right? The Board has rules with respect to what they do. And Mr. Clark had since left the federal government. I mean, this does happen. And so, this is not an extraordinary or unlawful or improper thing that the Board did, right? I disagree. It actually runs afoul of the standard and factor test that has eight factors that the Board set out in Bornicoff to evaluate the use of an out-of-court statement and its weight within and comparing it to or in lieu of live testimony. The agency did not, it's the agency's burden to meet, as I know the court knows, to meet its standard of proof. And the agency needs to call the witnesses that it needs to call to meet that standard of proof. And it is petitioner's position that it did not do so. And if the judge had performed a proper Bornicoff factor analysis, that affidavit would have never come in. It would not have been included and it wouldn't have been relied upon. Additionally, the judge allowed Mr. Jones, the only witness for the agency, to improperly testify about facts that he had no first-hand knowledge and could not state. So, it was an improper... Which Bornicoff factor isn't satisfied here with respect to the Clark declaration? Your Honor, I'd argue all but one. The first one is the availability of the persons with first-hand knowledge to testify at hearing. The agency made no effort or no proffer about Mr. Clark's availability. But Clark was available to you. AJ said you could subpoena him and get him to appear. But it is not petitioner's burden of proof to meet. The petitioner does not have to make the agency's case for them or present the witnesses required to make the agency's case. So, even though he was an approved witness, the agency never sought to get his testimony, which it could have done. It could have done that as well. But it is not petitioner's responsibility to make the agency's case for them. Additionally, the statement of the out-of-court declarant was signed in an affidavit form, which it was. But there's an and part to that factor. And whether anyone witnessed the signing, there was no evidence proffered that the statement was actually from Mr. Clark, that that was his signature, that he actually wrote it. No one testified to that. There was no authenticity of the statement. Was that disputed by your client at the hearing? That there was an objection. Yes, there was an authenticity objection made by the counsel at the time during the hearing. There was no authenticity done. It was submitted after. I don't remember that that was one of the theories that you briefed on appeal here. Could you show me where that appears in the blue brief? In the brief? Yeah. Yes, Your Honor. The court's indulgence. It starts on page 21 of petitioner's case in chief. There it is. And then. Where's the question about the signature? Sorry. The objection, it's discussed on page 26 of petitioner's brief. And it cites to the 221. There's actually. I'm sorry. Counsel, again, timely objected that this was highly prejudicial because she had not had the opportunity to cross. Yeah, but where's the question about the signature being found? The authenticity of it. That is a part of the discussion in the transcript that is exchanged with the judge. It's a multi-page discussion about the admission. Where is it in the blue brief? I do believe that the exchange is cited, but I don't know that it's being stated the way in Okay. So, Burnkoff was the MSPB case. That's correct, Your Honor. And I think the government relies on its side on one of our opinions, which is Cooley. What's your response to that case? Which I think they claim is pretty close to ours. I'm sorry. I didn't hear you. I'm sorry. Cooley, K-E-W-L-E-Y. The facts are slightly different. The court has found, held in the variety of decisions that mention the Burnkoff standard, that it can review the standard. As you pointed out, it is a board standard. It is not a court standard. It is not a statute. And it is a case-by-case evaluation. Where the judge is, both of them, when a foul at the hearing and then in the initial decision, is the discussion of it. Well, there is no discussion of it in the initial decision when looking at the agency's case-in-chief. She does not go over the Burnkoff factors at all when discussing it. It is discussed during the hearing, a different judge. But he says he will review and weigh it appropriately. But that analysis was not done because that judge did not issue the decision. And the later judge's decision does not include that analysis. Yeah, but I'm asking, at page 43, they cite, starting at page 42, they say, you're suggesting that the agency can't use burden of proof by relying on hearsay evidence. And then they cite, they quote our opinion in Cooley as saying, it's long been settled that hearsay evidence may be used for board proceedings and may be accepted as preponderant evidence even without corroboration if, to a reasonable mind, the circumstances are such evidence to lend its credence. And then they go on to cite cases where this is especially true in 43 cases which have a lower standard. So do you have a response to that? It is, as you said, it's a factor-by-factor, case-by-case situation. Here, there was no, in that, if I understand that decision correctly, there was an analysis done. And it's correct that it can be considered, but the board judges need to go through that analysis. And the fact that the judges both talk about the analysis, the case itself, Bornakoff, the actual word is in the hearing transcript multiple times, the fact that they mention it means that they were understanding that there had to be a standard applied to this case, and it was not. The factors... Did you argue in your blue brief that the Bornakoff factors weren't satisfied? I'm sorry, I didn't hear the start of your question. Did you argue in your blue brief that the Bornakoff factors weren't satisfied? Yes, Your Honor. That's, I believe I was page 20. That's, well... Did you cite Bornakoff? It's not in your table of authorities. Um, yes, Bornakoff is... The case, well, okay. Yes, Your Honor, the case was cited in the reply brief. My apologies, the name itself appears... It wasn't cited in the blue brief. That is correct, Your Honor. This argument wasn't made in the blue brief. The argument you're making now about failure to analyze the Bornakoff factors was not made in the blue brief. Not in the manner in which I'm it now. No. I don't think it... The credibility of the statement, the lack of support for the statement was discussed, but not specifically the factor analysis. That's correct. It was discussed in the reply brief, pages 1 and 8. Without Mr. Clark's statement being a part of the record, the agency could not meet its burden to establish the facts necessary to sustain the removal. And respectfully, we request that the court reverse the lower court's decision and find that it failed to meet its burden. Actually, the Clark declaration was relied on by the A.J. only for a limited purpose, and that was on the whistleblowing thing, which is your burden of proof. I disagree, Your Honor. So in the decision, she doesn't say it, but she said Clark said, Clark examined. And she cites to the part of the record, tab 3 in the pages therein, to his affidavit, I believe at least three times in her analysis. So while she doesn't say it, she uses words like Clark examined, Clark said, Clark stated. Well, he never stated anything during the hearing. The only way that he stated anything was in this statement. So she did rely pretty... Threw out her analysis on this statement. Okay. We're out of time. We'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Carver. Could you address that last point? I read the A.J.'s decision as saying that she was relying on the Clark declaration only for a limited purpose, that is, as to whether he had been disciplined in connection with these earlier events, eight or nine years earlier. Did she rely on the Clark declaration for other purposes? May it please the Court. Sure. I'll start with that. So there are a couple of... I have the same general understanding as you do, Judge Dyke. She talks about the affidavit appendix. 3031 in connection with this whistleblower defense. There are a couple of stray references to the declaration at other points. For example, the fact that Mr. Clark was the supervisor at appendix four, Clark EEO affidavit is cited. I don't see any of those other references as being disputed. We focused on the appendix 31 discussion because Mr. Williams' blue brief focused on that discussion. So we didn't understand Mr. Williams be raising any challenges besides the whistleblower use of the Clark affidavit. So on that point, there is a footnote in our brief that makes that point more clearly. So on the affidavit, as the Court noted, it is undisputed, I think, that hearsay can be allowed in board proceedings. Really the question in a case like this is how much weight does an affidavit like this get? And the board is, the AJA is pretty careful about setting out the factors and then explaining that her use of the Clark affidavit is for a very limited purpose to address a very specific point related to an issue on which Mr. Williams bears the burden of proof, and that is whether Mr. Clark was disciplined in 2009. I think it's important to note that the contrary evidence on that point is equivocal testimony from Mr. Williams himself, who didn't have any basis, as far as I know, besides what he heard second or third hand for thinking that Mr. Clark might have been suspended. So it's used for a very limited purpose based upon this long-applied test. There was no legal error, certainly, because I don't think there's any dispute with using that MSPB case from the 1980s, those factors. It's really either abusive discretion or substantial evidence that the Court's looking at how those factors were applied to this case. So that's the affidavit. I think to address the other sort of big picture arguments that Mr. Williams is making, on the training, he's contesting whether he received appropriate training to do the work he was assigned. I don't think he disputes, a lot of this case is undisputed. The validity of the performance standards, undisputed. The notice, undisputed. What about the stuff that we started with your friend about, which is the occurrence of the PIP and what went down on the PIP with respect to training, and also his lack of access to the server and things like that? That seems to be in dispute. Those, I think, are the points that are in dispute, Judge Prost. So on the training, this is relitigating an issue that was decided by the AJA in Appendix 18 and 19. The AJA's view, which is reasonable, is first, Mr. Williams' resume suggested he could do this work. It's a work that requires subject matter expertise. He was offered certain forms of training. You can see that in Appendix 984 and Appendix 914. In his testimony, Mr. Williams said he took three courses in 2016 and 2017. He had a book that was bought for him. It was the only book he requested. But ultimately, he insisted on classroom training. He didn't think YouTube training was appropriate for him. So he insisted on formal classroom training, which, of course, costs money. Agencies have budget constraints. But all these issues really are about, you know, was he given a reasonable opportunity to improve? That's the big-picture question. But what he really seems to be saying is, I shouldn't have gotten this job in the first place because I wasn't qualified. Right. I think that's right. In the agency, in 2016, it's important that they offered him a reassignment. So just backing up for a second, he was promoted in 2012 from a GS-12 to a GS-13 position. He had been working in the help desk for a number of years doing help desk-related tasks. He's promoted to this programmer position in 2012. Between 2012 and 2016, he continues to do GS-12 level work while getting paid a GS-13 salary. In 2016, the agency has a new SES come aboard, do a review of positions to make sure people are working in line with their position titles, that their pay is justified by the work they're doing. They realize Mr. Williams is working out of his pay grade doing help desk work while getting a pay grade. Didn't he also complain about the help desk work sort of disability thing that he wanted out of the help desk? He did talk about that. There are references to that at different points in the record as well. But the agency does give him an opportunity. If you can't do the GS-13 work, you have a choice. You either need to perform at the GS-13 level or go back to a GS-12 role. He decides he wants to continue getting the GS-13 salary. So he wants to continue doing the GS-13 work. At that point, it's incumbent upon him to be able to perform at that level. This is mid-2016. November 2016, he gets a notice saying he's performing at an unacceptable level. The same elements that later become the basis of the PIP doesn't improve, doesn't seem to be checking the server that has all his work, the SharePoint-like site. And then fast forward several months later to March of 2017, that's when the PIP comes. He continues to not do any work. What about the server access claim? Right. So on the server access point, this is another issue that was addressed by the AJ. So starting in mid-2016, he raises the issue a couple of times. The agency tries to help him with it. The issue being server access. He's not getting access. He says he's not getting access. Sometimes he says he wasn't trained properly. So whether it's an access issue or a training issue is a little unclear. But what the AJ relies on is testimony from Mr. Jones saying this is elementary. You'd expect anybody at his level should be able to use the server first. Second, he admits in his testimony, Mr. Williams does, that he just eventually gave up on trying to access the server. Was access the server something that he was denied access or that he didn't have the technical skills to access? Right. So what the AJ said is he should have been able to figure it out based on the record that was before her. And part of that is he stopped trying, he admits, at Appendix 40415, he decided he was going to stop trying to get access. So it sounds like there was no, he wasn't denied access, right? It's more so a lack of trying in terms of access to the server. Is that true? I think the record supports that. I think his position, at some points he suggested that his credentials didn't work. But he could have addressed that. You see email correspondence between Mr. Williams and others within the agency where they're trying to help him access it, they give him advice on it, and the trail just runs cold. So for an employee who's facing a PIP, facing notice of unacceptable performance, if you're not able to access the server, if that's really the issue, then there should be a long paper trail that shows all of your efforts made to try to overcome that. Ultimately, these are all substantial evidence questions for the agency, or for the AJ, excuse me. The AJ looked at all looked at the testimony and said, in her view, this is a problem he should have been able to overcome. And there's no cause to overturn that on appeal. And then Counsel, how much of the Jones testimony actually needs to be relied on in light of the extensive written record otherwise? So I think the Jones testimony, I don't know that it needs to be relied on at all. I think the AJ's decision can be affirmed based on the documents, the performance standards, the fact that he didn't do any work, which he admits, Mr. Williams admitted in his PIP. And I think that's probably enough. I think Mr. Jones really was walking through his thinking of how these documents that he relied on relate to the action that he took. So he's the deciding official, you know, that's all fair game for the AJ. But in terms of the AJ's actual analysis of the elements, which is at Appendix 11 to 19, I think that the documents and Mr. Williams' own admissions really get over the substantial evidence barrier. What about, just as an aside, your friend commented that he was on medical leave for all but 21 days of the PIP? Right. So a couple points on that. The AJ addresses that issue in the context, I think, of a rehabilitation claim at Appendix 26, 27, and 28. So the AJ said, first, there's no indication of—he didn't ask for FMLA leave until after the PIP ended, A. B, he didn't give any indication of some sort of disability that the reasonable accommodation could have addressed. He said he wants—the work was stressful, but there's no requirement of a PIP. And ultimately, the agency could reasonably conclude that extending the PIP to address this issue wouldn't have helped because, A, his attitude towards the PIP. He didn't think it was a legitimate PIP. We cite some of those emails in our brief where Mr. Williams calls it, you know, just sort of a bad faith attempt to punish him, essentially. Under those circumstances, the idea that extra time would have helped is hard to understand. Under the circumstances where he's not accessing the server, where he's already had between November and the end of April to address these issues, and he just clearly is not capable of doing the work at that point. And, you know, the agency could reasonably conclude that he'd been given enough opportunities to do the work, and he hadn't done it. If there are no further questions, we ask that the Court affirm. Okay. Thank you. It's wrapped, Holly. You have two minutes. Thank you, Your Honor. I believe I reserved three minutes, didn't I? I thought I did. You reserved, but you used it for— Oh, I'm so sorry. I didn't understand that. Thank you. I want to highlight the references to Mr. Clark's affidavit just for clarity in the judge's decision, and the big component at the end. So at the end of her analysis and under the headings decision on page eight to nine, she says, referring to Mr. Jones, Mr. Jones concluded Appellant made no effort to start or complete any of the PIP tasks, which Mr. Jones testified that he had no independent knowledge of that fact. And further, he agreed that the change in the Appellant's performance ratings came about because the agency began requiring him to perform a GS-13 database software developer position for which he was selected, as opposed to the technical support help desk duties that he had been provisionally performing since 2005. And the tab three at 59 is a cite to the Clark affidavit, which is where that information comes from. Additionally, as I previously said, she cites to it on page four, twice, and five. To address some of the points that Respondent made, he was denied access through his credentials. He was unable to access it, and he kept following up with Mr. Clark. That is his hearing testimony. The Respondent testified that they don't need the Jones's testimony, which I think gets to the heart of the issue. Mr. Williams requested a hearing. He elected to have a hearing so that live hearing testimony could be presented. He didn't waive that right. If you take out all of the Jones testimony and the Clark affidavit, there was no testimony, and there was no evidence presented other than what was in the record. None of that is sufficient to sustain the removal. I think we're out of time. Your Honor, may I have a moment to conclude? We're done. Thank you. Thank you, Your Honor. The case is submitted. Thank you.